**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 19, 2011

No. 10-20344

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

NORBERTO ADOLIO ROBLES,

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC 4:08-CR-374-1

Before KING, WIENER, and CLEMENT, Circuit Judges.

KING, Circuit Judge:[*]

Norberto Adolio Robles pleaded guilty to conspiracy to possess with intent to distribute five or more kilograms of cocaine, and the sentencing judge imposed a mandatory minimum sentence of 120 months' imprisonment. Robles appeals his sentence and the district court's denial of his motion to withdraw his guilty plea. We AFFIRM Robles's conviction, but REMAND the sentencing issue to the district court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20344

Norberto Adolio Robles ("Robles") and his brother, Israel Robles ("Israel"), were indicted for conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. Robles retained attorney Eric Reed ("Reed") as paid counsel, and attorney Erik Sunde ("Sunde") later enrolled as Reed's co-counsel. Pursuant to a plea agreement, Robles pleaded guilty to the conspiracy count on December 15, 2009. As part of the plea agreement, the government agreed to move to dismiss the possession count, to recommend that Robles receive full credit for acceptance of responsibility, and to recommend that Robles be held accountable for 125 kilograms of cocaine, rather than the 1,055.22 kilograms of cocaine represented in the drug ledgers seized from Israel's house.

Following Robles's guilty plea, Reed received the presentence report ("PSR") on February 17, 2010. Reed reviewed the PSR with Robles and discussed his sentencing with him several times. Reed pushed Robles to consider various options for mitigating his sentence, but Robles apparently rebuffed his suggestions. Beginning approximately two months after Robles's guilty plea, Robles sent a series of letters to the court complaining about his attorneys, requesting court-appointed counsel, and stating that he pleaded guilty because he was afraid that his house would be seized by the government, among other grievances. Reed later filed a sealed motion requesting permission to withdraw as Robles's counsel. In the motion, Reed stated that despite meeting at least five times with Robles to discuss the PSR and sentencing, communication had broken down between them. Reed also observed that Robles seemed intent on disregarding his advice and that Robles had begun bypassing him by sending letters directly to the court.

On April 6, 2010, the court held a status conference, attended by Robles, Reed, Sunde, and an Assistant United States Attorney. The trial judge commenced the conference by addressing whether an arrest warrant had even been issued for Robles and requested that the government provide the court with

2

a copy.[1]  The judge asked whether the defense had anything to discuss.  Sunde asked that "any ruling the court make[s] vis-a-vis Mr. Reed['s] motion to withdraw], that [Sunde] be included in that."  The judge explained that Reed had incorrectly filed a proposed motion granting his withdrawal as counsel instead of requesting permission to withdraw and showed the attorneys the revised version he had prepared: "See, I've rewritten—I ordered the motion granted that says Eric Reed may withdraw as counsel for [Norberto] Robles."  Addressing Reed and Sunde, the court added, "You may get out [of the case]."  Reed and Sunde, however, remained present for the remainder of the status conference.

The judge then noted that Robles had submitted several letters, and that "there's some talk in there like you want to withdraw your plea because you didn't understand what happened. . . .  You understood. . . .  I told you that you can't withdraw your plea.  And, so, we're kind of stuck with where we are.  We're awaiting sentencing."  The judge confirmed the date of the sentencing hearing with Reed and the government.  When the judge asked if the defense had anything else, Robles proceeded to argue that he had pleaded guilty "because of a threat."  The judge asked Reed, "Do you know what threat he's talking about?"  Reed responded that "in one of the letters [Robles] wrote to the court, . . . he indicated . . . that [Israel's attorneys] and I threatened him into pleading guilty under peril of losing his home if he didn't do so before Christmas."  Reed explained that he never threatened Robles, but that he did explain to him the consequences of a conviction, including forfeiture of his home.  Reed noted that because Robles pleaded guilty, the government permitted Robles's family to remain in his house.  Reed added that, to the extent that Robles was arguing that Israel's attorneys wrote a threatening letter, Israel's attorneys "are not his lawyer.  I am. . . .  I represent Mr. Robles."

---

[1] Robles later submitted letters to the court requesting a copy of his arrest warrant on March 7, 2010, and March 14, 2010.

No. 10-20344

Robles presented the judge with a letter addressed to Israel that Israel's attorney had written. The judge read the note and concluded that "it's not a threat," and that the letter was "only threatening in the sense that it describes the consequences of a choice." The court stated, "[t]he problem, Mr. Robles, is standing in a public, well-lighted courtroom full of normal people, my staff, and the lawyers, I asked you if anybody threatened you, and you swore to me that no one had." The judge continued: "Mr. Robles, I've tried to be plenty careful with you, but this is not a game. You had plenty of time to think about it. There may be some additional pressure, but you've had good lawyers and we've gone through every conceivable aspect of this case and the evidence." The judge then asked Reed and the government about sentencing. Reed discussed the plea agreement and the PSR, noting that he hoped Robles would sign a letter of acceptance of responsibility or cooperate with the government to be eligible for a U.S.S.G. § 5K1 motion. When asked by the judge if there were "any major problems" with the PSR, Reed replied that there "may be an issue between [Robles and the government] . . . . I think there's going to be a difference between the Government and defendant on the role in the offense. . . . I think we'll have a disagreement on what Mr. Roble[s]'s role was. . . . [T]he Government will view him as having a larger role than [Robles] will."

Robles interrupted this discussion to argue that cash seized by the government did not belong to him but instead belonged to his mother, emphasizing again that he had been pressured into signing the plea agreement.[2] Reed countered: "I was not putting any more pressure on him other than telling him what the evidence was. I had no means of threatening him, obviously." The judge concluded:

---

[2] Robles stated that "[t]he day we pled guilty . . . . [Reed] told me, 'You have to plead guilty because you are guilty. Accept your responsibility.' And I would tell him, 'What responsibility? What have you done for me? I have given you all the proofs. Why do you want me to plead guilty?'"

Mr. Robles, the time for your mother, not just to come tell us about her money but to show Mr. Reed and [the government's lawyer] information that they reasonably would believe it was her money, has long past [sic]. You and your brother can't swear to something and then say later on, [w]ell, it's wrong because we could have proved something to the contrary. The government showed you . . . its case and, in the face of that, . . . you pleaded guilty. And now . . . you want to equivocate. And you may not do it because you were not misled. You were not under duress. You were not rushed.

The judge briefly discussed the issue of the arrest warrant again and reiterated his request that the government provide the court with a copy. Before ending the conference, the judge asked both Reed and the government if they had anything further to add and both responded that they did not. After the conference, the court entered an order stating: "In response to his several letters and other papers, Norberto Robles's plea of guilty was voluntary and knowing."

From the end of the April 6 status conference until his May 10 sentencing, Robles was unrepresented despite several requests that the court appoint counsel for him.[3] Accordingly, Robles appeared without counsel for his sentencing on May 10. Immediately after the government's lawyer greeted the judge, the judge called out to an assistant federal public defender, Phillip Gallagher ("Gallagher"), who happened to be in the courtroom. Gallagher, apparently surprised, responded, "Sorry, Your Honor?" The judge then asked Gallagher: "Were you[ ] ever in the military? . . . Because you've just been drafted. . . . I would like you to just stand by perhaps to answer questions while I try to figure out where we are with Mr. Robles."

---

[3] On April 27 and 29, 2010, Robles submitted two letters written in Spanish to the court requesting the appointment of a public defender who spoke Spanish, explaining that he lacked funds to hire one himself. On May 5, 2010, Robles submitted another letter, this time in English, "request[ing] to be represented by counsel at sentencing," and explaining that he "never received nor reviewed [his] PSR and d[id] not know what it sa[id]." Robles "wish[ed] to review it so proper objections c[ould] be made should the court decide[] to proceed to sentencing."

No. 10-20344

After Robles was sworn in, the judge asked him whether he had retained a new attorney. Robles said he had not "[b]ecause I do not have the money to do so, and I requested the Court to assign me one." The judge responded, "You had the money to hire the other two, and now you've run them off. Why am I going to appoint you one at the public expense for you to run off, and then you'll want another one? . . . . What do you think another lawyer is going to do? You stood here and swore to me that you did it. Now you want to change your mind. You swore you understood when I told you that you can't change your mind. What's the lawyer going to do for you?"

Robles responded, "I don't know what any attorney will do for me," and alleged that he had not received *Miranda* warnings when he was arrested. The judge replied, "Mr. Robles, I have decided, not Mr. Reed, I have decided that that is over. You are wrong on that. I don't expect you to like it; I don't expect you to understand it. That's why you have lawyers. But having gone over it for months with two different lawyers and you, and [the prosecutor] and Lord knows how many other people, it's over. It's over because I ruled against you and it's over because you pleaded guilty. You can't stand there and swear you did it and then decide that you need to talk to *Miranda*." Robles reasserted that he was threatened into pleading guilty: "I had a meeting with Your Honor where I denounced all the violations foreseen. . . . After that, my brother and myself with the letter that was handed to him, we had no option because all the motions had been denied. So when one finds himself totally lost, with no defense, one has to make one's self guilty or not guilty either be or not be or could be innocent." The judge responded, "Robles, you made yourself guilty but not here lately. You made yourself guilty when you did the underlying things. If all the rulings go against you, it's because you're wrong. . . . Your problem is entirely Roberto Robles [sic]. You had an opportunity to work with the government to

6

minimize the effect of what you've done. You did it for awhile and then didn't do it for awhile, or didn't do it at all. I don't remember."

After an exchange with the Assistant United States Attorney, the judge eventually returned his attention to Gallagher, and explained the case to Gallagher as follows: "[T]he procedure is longer [than] I recited because I can't remember the details but Mr. Gallagher, this has been on again, off again, he announced he wanted to plead guilty three times, I think. We got to the end and he just . . . wouldn't do it. I think twice I've met with him in chambers on the record with the lawyers to try to discuss with him why his lawyers were doing what they could and what the situation was, trying to bring him understanding." The judge then asked Gallagher if he spoke Spanish, and Gallagher answered in the negative. The judge concluded, "He does everything, he gets up to accountability, and balks. And there is a plea agreement that limits the areas of great controversy. . . . Basically, there's no objection that could alter the ten-year minimum." Gallagher responded, "I understand there may be no way around the statutory minimum . . . . Assuming, obviously, as the Court says, that ship has sailed, even so, if the Court wishes, I would request at least a brief continuance so I can have an opportunity to look at the PSR. . . . I don't know what the government's recommending. If the government is recommending a sentence above the statutory minimum, then I would . . ." The judge cut Gallagher off and stated: "[The government] is not [recommending an above-minimum sentence]. [The government's lawyer] doesn't even want to." Gallagher persisted: "May I have just a second to see whether [Robles] has any questions, Your Honor?" The judge then granted a twenty-minute recess.

After the recess, Gallagher informed the court that he and Robles "talked briefly about the presentence report." The judge asked Robles directly, "Mr. Robles, do you want to go ahead with the sentencing today?" Robles responded, "I don't know what to do, sir. I leave it in the hands of the attorney who is

representing me today," referring to Gallagher. The judge responded, "Mr. Gallagher is a fine attorney. He obviously is not as familiar with the case as your earlier attorneys were, but he has seen the dilemma of the statutory minimum which no amount of lawyering can take care of. . . . I believe that you have been fully and fairly represented in the sentencing phase and have had every opportunity to take advantage of the mechanisms that might have lowered your sentence." The judge sentenced Robles to the statutory minimum sentence of 120 months' imprisonment.

The government raised the issue of forfeiture of cash and property seized, and the judge explained to Gallagher: "We have discussed earlier, Mr. Gallagher, that the government is forfeiting the brothers' stuff but leaving in effect the community interest." The judge then directed the government to submit a proposed order to the court listing the items to be forfeited and to "favor Mr. Gallagher with a copy, as well as []one . . . directly to Mr. Robles."

The judge asked if Gallagher had any questions, and Gallagher requested a copy of the plea agreement "for purposes of appealing." The judge notified Robles of his right to appeal, informed Robles that he had the right to have an attorney appointed for him on appeal, and adjourned the hearing.

Robles timely appealed, asserting that he was denied his Sixth Amendment right to counsel from the April 6 status conference through May 10, including his appearance in court for sentencing.

## II. DISCUSSION

This court reviews constitutional challenges and questions of law de novo. *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002); *United States v. Walker*, 148 F.3d 518, 528 (5th Cir. 1998). "[W]hether [a defendant]'s right to counsel was constructively denied [under *United States v. Cronic*, 466 U.S. 648 (1984]] . . . is a mixed question of law and fact, subject to *de novo* review."

No. 10-20344

*Childress v. Johnson*, 103 F.3d 1221, 1224 (5th Cir. 1997); *see also United States v. Job*, 387 F. App'x 445, 449-50 (5th Cir. 2010).

A. *The Right to Counsel*

The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "An accused's right to be *represented* by counsel is a fundamental component of our criminal justice system." *Cronic*, 466 U.S. at 653 (emphasis added). The mere *presence* of counsel is insufficient; a defendant is not represented by the counsel as guaranteed under the Sixth Amendment simply because an attorney is standing next to him during a hearing. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940) ("[T]he denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel.").

"It is well settled that [the Sixth Amendment] means that a defendant is entitled to be represented by counsel at all critical stages of a criminal proceeding against him; critical stages of a criminal proceeding are those stages of the proceeding at which the substantial rights of a defendant may be affected." *United States v. Taylor*, 933 F.2d 307, 312 (5th Cir. 1991) (citations omitted). While neither the Supreme Court nor this court has delineated all of the stages at which the presence of counsel is required, the focus is on whether there has been a "denial of such significance that it makes the adversary process itself unreliable." *See United States v. Russell*, 205 F.3d 768, 771 (5th Cir. 2000) (citing *Cronic*, 466 U.S. at 658-59, 662).

Normally, a defendant asserting a violation of his Sixth Amendment right to counsel is required to demonstrate that counsel's performance was deficient and that he suffered prejudice as a result. *See Strickland v. Washington*, 466

U.S. 668, 700 (1984).    However, there are three situations that involve circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified": (1) the "complete denial of counsel"; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) where "surrounding circumstances ma[k]e it . . . unlikely that any lawyer could provide effective assistance." *Cronic*, 466 U.S. at 658-61.

On appeal, Robles asserts that he was completely denied counsel in violation of his Sixth Amendment rights from April 6 through May 10, including at the April 6 conference and at the May 10 sentencing hearing.[4]

## B.  *The April 6 Status Conference*

Robles contends that, when the district court addressed his motion to withdraw his guilty plea at the April 6 status conference, he was without counsel.[5]  Prior to April 6, Robles had written several pro se letters to the court asserting that he had pleaded guilty because of a threat, but he had not yet

---

[4] In his plea agreement, Robles agreed to waive his statutory right "to appeal the sentence imposed or the manner in which it was determined, on any ground set forth in Title 18 U.S.C. § 3742."  Robles asserts, and the government agrees, that this waiver does not bar the issues raised on appeal.  We need not address whether Robles's appellate waiver bars his appeal because the government has waived this argument.  *See United States v. Story*, 439 F.3d 226, 231 (5th Cir. 2006) ("Story's waiver of appeal is enforceable to the extent that the government invokes the waiver provision in his plea agreement.  In the absence of the government's objection to Story's appeal based on his appeal waiver, the waiver is not binding because the government has waived the issue.").

[5] At oral argument, Robles argued for the first time that there was a conflict of interest between Reed and Robles.  "The Sixth Amendment right to counsel includes the 'right to representation that is free from any conflict of interest.'" *United States v. Garcia–Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (quoting *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993)).  By failing to make this argument in his initial brief, Robles has waived it.  *See DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 326 n.2 (5th Cir. 1997) ("[A] party who fails to raise an issue in its initial brief waives the right to review of that issue.").

lodged a formal request to withdraw his guilty plea.[6]  For purposes of this appeal, we presume that the court construed the statements in Robles's pro se letters as requests to withdraw his guilty plea and that the April 6 status conference was akin to a hearing on a motion to withdraw a guilty plea.  We also assume, without deciding, that the hearing on a motion to withdraw a guilty plea was a critical stage of the proceedings requiring the right to counsel.  The second assumption is informed by a survey of our sister circuits.  *See Forbes v. United States*, 574 F.3d 101, 106 (2d Cir. 2009) ("A motion to withdraw a guilty plea is a critical stage of a criminal proceeding."); *United States v. Segarra–Rivera*, 473 F.3d 381, 384 (1st Cir. 2007) (same); *United States v. Garrett*, 90 F.3d 210, 212 (7th Cir. 1996) (same); *United States v. Crowley*, 529 F.2d 1066, 1069 (3d Cir. 1976) (same); *United States v. Joslin*, 434 F.2d 526, 529-30 (D.C. Cir. 1970) (same).

We conclude that Robles was not deprived of his right to counsel at the April 6 status conference.  Although the trial judge granted Reed and Sunde *permission* to withdraw as counsel at the beginning of the conference, Reed and Sunde continued to serve as Robles's counsel for the duration of the conference.  After granting the motion, the judge asked Reed numerous questions, including questions regarding Robles's request to withdraw his guilty plea.  In answering these questions on Robles's behalf, Reed referred to himself as Robles's attorney—e.g., "The[y] . . . are not [Robles's] lawyer.  I am."  At the close of the conference, the judge asked Reed and Sunde if they had anything more to discuss before ending the conference. Additionally, the conference minutes, entered by the district court into its docket after the conference ended (and *before* the court entered the order permitting Reed and Sunde to withdraw), state that Reed and Sunde represented Robles at the one-hour conference.

---

[6] Subsequently, Robles did file a formal pro se motion to withdraw his guilty plea. This motion, dated May 5, 2010, was not received by the court until after Robles was sentenced.

Although the court may have granted Reed and Sunde *permission* to withdraw at the beginning of the conference, they continued to serve as Robles's counsel during the course of the conference and did not effectively withdraw until the conference ended. We find that Robles was therefore not deprived of his right to counsel at the April 6 conference.[7]

## C. *The Period Between the April 6 Conference and the May 10 Hearing*

Following the withdrawal of Reed and Sunde, Robles was completely without counsel during the period between the end of the April 6 conference and his May 10 sentencing. This was part of Robles's presentencing period which stretched from December 15, 2009, when Robles pleaded guilty, to May 10, 2010, when Robles was sentenced. If this presentencing period was a "critical stage" in the proceedings and if Robles had lacked counsel, then Robles's Sixth Amendment right to counsel would have been violated. *See United States v. Ash*, 413 U.S. 300, 321 (1973) (Stewart, J., concurring) ("This Court's decisions make it clear that a defendant is entitled to the assistance of counsel not only at the trial itself, but at all 'critical stages' of his 'prosecution.'") (citations omitted). Importantly, Robles was represented by Reed for a large part of this period: from his December 15, 2009 guilty plea to the April 6, 2010 status conference. Accordingly, the relevant question on this issue is whether the absence of counsel for *the latter part* of the presentencing period constituted a complete denial of counsel at a critical stage for *Cronic* purposes. We find that it did not.

---

[7] Robles also contends that the district court abused its discretion in denying his motion to withdraw his guilty plea "because Mr. Robles was without counsel when the district court considered the motion." Because we find that Reed represented Robles at the April 6 conference, this argument is unpersuasive. As Robles has not advanced any arguments relating to the underlying merits of the district court's determination that his guilty plea was voluntary and knowing, the district court did not abuse its discretion in denying Robles's motion to withdraw his guilty plea. *See United States v. Carr*, 740 F.2d 339, 343-44 (5th Cir. 1984). Accordingly, we affirm the district court's denial of Robles's motion to withdraw his guilty plea.

No. 10-20344

We begin by assuming, without deciding, that the presentencing period was critical.[8] We then inquire as to whether Reed's representation of Robles, during the roughly four months between Robles's guilty plea and Reed's withdrawal after the status conference, was sufficient to satisfy Robles's Sixth Amendment right to counsel. This inquiry depends on what it means to have counsel during a critical stage.

As we noted above, a "critical stage in the proceeding is one where 'the accused require[s] aid in coping with legal problems or assistance in meeting his adversary,' and the 'substantial rights of the accused may be affected.'" *McAfee v. Thaler*, 630 F.3d 383, 391 (5th Cir. 2011) (quoting *Ash*, 413 U.S. at 311, and *Mempa v. Rhay*, 389 U.S. 128, 134-35 (1967)). "The inability of [a defendant] on his own to realize the[] advantages of a lawyer's assistance" when facing "potential substantial prejudice to [his] rights[,] . . . and the ability of counsel to help avoid that prejudice," can signal a critical stage. *Coleman v. Alabama*, 399 U.S. 1, 9 (1970). Thus, as one sister court has explained, "a *Cronic* critical stage [is determined by] (1) whether the failure to pursue strategies or remedies results in a loss of significant rights, (2) whether counsel would be useful in helping the defendant understand the legal issues, [and] (3) whether the proceeding tests the merits of the defendant's case." *McNeal v. Adams*, 623 F.3d 1283, 1289 (9th Cir. 2010).

---

[8] At least one sister circuit has adopted the idea that the possibility of negotiating a reduced sentence is sufficiently important to make the presentencing period a critical stage. *See United States v. Leonti*, 326 F.3d 1111, 1118, 1120 (9th Cir. 2003) ("As substantial assistance [to the government as a means of reducing a criminal sentence] has become the last, best hope of so many defendants, the guarantee of competent counsel must apply to the process of seeking such a recommendation. . . . Because the period of cooperation [with the government prior to sentencing] is an adversarial confrontation 'in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice,' it is a critical stage of a criminal proceeding.") (citations omitted).

"To justify a particular stage as 'critical,' th[is] Court has not required [a] defendant to explain how having counsel would have altered the outcome of his specific case.  Rather, th[is] Court has looked to whether 'the substantial rights of a defendant *may* be affected' during that *type* of proceeding." *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001) (en banc) (emphasis added) (quoting *Taylor*, 933 F.2d at 312).   As another sister court has explained:

> If [a particular proceeding is] a critical stage, because [defendant]'s counsel was entirely absent, there is no need [for the defendant] to make a showing of prejudice.  Whether [a proceeding is] a critical stage depends on whether there was a reasonable probability that [the defendant]'s case could suffer significant consequences from his total denial of counsel at the stage. . . .   [T]he overarching legal question of whether a particular proceeding is a "critical stage" of the trial should focus not only on the specific case . . . , but the general question of whether such a stage is "critical."

*Van v. Jones*, 475 F.3d 292, 313-14 (6th Cir. 2007).

During the presentencing stage, defense counsel has several functions to fulfill.  The Local Rules of the Southern District of Texas suggest some of these. *See* S.D. Texas Crim. Local R. 32.  First, defense counsel can assist a defendant with understanding the PSR, finding errors within it, and raising appropriate legal challenges.  S.D. Texas Crim. Local R. 32.5-6.  Second, defense counsel can help a defendant negotiate with the government in order to obtain a "substantial assistance" motion, such that the government recommends a lower sentence to the court.  *See Leonti*, 326 F.3d at 1118 ("[I]t is not surprising that sentencing has become the effective focus of a defendant's efforts to secure a favorable outcome.   In this regard, many defendants attempt to cooperate with the government in hopes of persuading the government to file a 'substantial assistance' motion.  Obtaining such a motion is critical to a defendant's hope of a reduced sentence.   With it, the sentencing judge may depart from the guidelines and reduce the defendant's sentence in an amount reflecting, *inter*

No. 10-20344

*alia*, the nature, extent, and usefulness of the defendant's assistance.") (citing U.S.S.G. § 5K1.1); *see also* 18 U.S.C. §§ 3553(e), (f) (providing for sentence reductions below the statutory minimum).

With this in mind, we find that Robles had counsel for the presentencing period. We note several salient facts revealed by the record. First, as Robles's own appellate counsel recognizes, "[Reed] and [Robles] had met on numerous occasions to prepare for sentencing, review and discuss the PSR, and discuss opportunities to mitigate [Robles]'s punishment." *Appellant's Br.* at 17. In his sealed motion to withdraw as counsel, Reed made clear that he had attempted to discuss the PSR and sentencing with Robles on at least five separate occasions, but that Robles apparently intended to disregard his advice. Indeed, Robles, against Reed's advice, had rejected two more favorable plea offers from the government before finally pleading guilty on December 15, 2009.

Second, Reed made reference to these efforts during the April 6 conference. Reed explained that "[he] would [have] . . . like[d] Mr. Robles to sign a letter of acceptance of responsibility." However, "[Robles] declined to do so." Reed later explained that he was "hoping that Mr. Robles might avail himself of some of the departure opportunities . . . [of which] there were several . . . . There was some low-hanging fruit [such as], perhaps, mitigating his sentence through a [U.S.S.G. §] 5K1 motion that would require him, Mr. Robles, to kind of step up . . . ."[9] Reed

---

[9] The district court itself, three times during the May 10 hearing, alluded to the fact that Robles had not availed himself before the hearing of any opportunity for a reduced sentence. The court told Robles, "[y]ou had an opportunity to work with the government to minimize the effect of what you've done." The court later stated, "I mean, that's where we're stuck, his opportunity to earn something beyond the statutory minimum." When Gallagher responded, "I understand there may be no way around the statutory minimum," the court interrupted and told Gallagher, "Well, there has been, but he has elected not to do anything." Just prior to sentencing Robles, the court stated that Robles "had every opportunity to take advantage of the mechanisms that might have lowered your sentence. But you have rather stubbornly refused to take advantage of any of those. And I'm not saying you have to, but you just can't have the advantage without going through the steps on which they are predicated."

15

then went on to raise some of Robles's concerns with the PSR at the April 6 hearing. Finally, it bears mentioning that, at his May 10 sentencing hearing, Robles also briefly reviewed the PSR with Gallagher.

Even if Robles lacked counsel for the period covering April 6 to May 10, he reviewed the PSR with Reed and later Gallagher, discussed his sentencing with Reed, and was encouraged by Reed to cooperate with the government in order to reduce his sentence. Taken together, the combined efforts of Reed prior to the sentencing hearing and Gallagher at the sentencing hearing were sufficient to fulfill the duties of defense counsel and meet the requirements of the Sixth Amendment right to counsel for the presentencing period as a whole. *See Craker v. McCotter*, 805 F.2d 538, 542-43 (5th Cir. 1986).[10] Consequently, we find that Robles was not deprived of his right to counsel during the presentencing period, even though he lacked counsel between the April 6 status conference and his May 10 sentencing.

*D. The May 10 Sentencing Hearing*

Robles also contends that he was denied the assistance of counsel at his sentencing hearing on May 10. Sentencing is considered a "critical stage" for Sixth Amendment purposes. *See Rhay*, 389 U.S. at 134-37. Robles argues that the sentencing hearing at issue in this case implicates the first *Cronic* situation described above—the complete denial of counsel. *Cronic*, 466 U.S. at 658-61. Robles asserts that he lacked counsel at the May 10 sentencing hearing, and that Gallagher, the assistant federal public defender "drafted" by the court, merely served as "standby" counsel.

A criminal defendant has "a fundamental right to be represented by counsel at his sentencing." *Taylor*, 933 F.2d at 312. Where a defendant chooses

---

[10] We emphasize that whether Robles was prejudiced by the performances of Reed and Gallagher is irrelevant for this inquiry. Under *Cronic*, we look only to see whether Robles suffered a "complete denial of counsel." *Cronic*, 466 U.S. at 659.

to represent himself pro se and waives his right to an attorney, the court may appoint "standby" counsel to serve a "limited" role.[11] *Id.* Where standby counsel is appointed to assist a pro se defendant:

> The defendant preserves actual control over the case he presents to the jury: standby counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and cannot speak in place of the defendant on any matter of importance. Standby "counsel" is thus quite different from regular counsel. Standby counsel does not *represent* the defendant. The defendant represents himself, and may or may not seek or heed the advice of the attorney standing by. As such, the role of standby counsel is more akin to that of an observer, an attorney who attends the trial or other proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense.

*Id.* at 313 (citation omitted). "[A]s useful as standby counsel may be when a defendant wishes to represent himself," when the defendant asserts his right to counsel, "standby counsel is not 'counsel' within the meaning of the Sixth Amendment." *Id.*

Hence, we ask whether Gallagher was actually appointed as full counsel for Robles, as opposed to standby counsel. The "dispositive question in [any *Cronic* analysis] . . . is whether the circumstances surrounding a [defendant's lack of] representation . . . justif[y] . . . a presumption" that the defendant's "conviction was insufficiently reliable to satisfy the Constitution." *Cronic*, 466 U.S. at 662. Therefore, "what constitutes . . . [the] 'absence of counsel' depends on an assessment of the facts of each case." *Burdine*, 262 F.3d at 354

---

[11] To proceed pro se, a defendant must "knowingly and intelligently forego counsel, and the request to proceed *pro se* must be clear and unequivocal." *United States v. Cano*, 519 F.3d 512, 516 (5th Cir. 2008) (internal quotation marks omitted). In advance of allowing a defendant to proceed pro se, the court must hold a *Faretta* hearing, to "caution the defendant about the dangers of such a course of action so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)). The district court never undertook such a hearing and there is ample evidence that Robles did not actually wish to proceed pro se.

(Higginbotham, J., concurring).  In this light, we examine the circumstances surrounding Gallagher's appointment as Robles's counsel, based on the record as a whole, to determine whether Gallagher was appointed as full counsel or merely standby counsel.  Although Robles's counsel on appeal is an assistant federal public defender and argues that Gallagher (also an assistant federal public defender) served only as standby counsel, we have no testimony from Gallagher as to whether he considered himself to have been appointed, and to have been serving, as Robles's counsel, as distinguished from standby counsel, either at the commencement of or at some point during the sentencing hearing. We examine below what transpired at the sentencing hearing, but ultimately we conclude that without Gallagher's testimony and related fact finding by the district court, we are unable to decide whether Gallagher served as appointed, or just standby, counsel.

In the first minutes of the hearing, the district court informed Gallagher, apparently to his surprise, that he had "just been drafted," and told him to "just stand by and perhaps to answer questions while I try to figure out where we are at with Mr. Robles."  This ambiguous direction to Gallagher that he "just stand by" was the only instruction that Gallagher received regarding his role in the hearing.  We have no way of knowing what kind of appointment the court intended to make or whether Gallagher understood his role to be that of appointed or standby counsel. Indeed, after Gallagher was "drafted," the district court asked Robles whether he had hired a new lawyer to replace Reed.  When Robles said he had not and mentioned his requests that the court appoint counsel, the court may have implied that it did not intend to appoint Gallagher, or any other attorney, to represent Robles:

> You had the money to hire the other two [lawyers], and now you've run them off.  Why am I going to appoint you one at public expense for you to run off, and then you'll want another one?  There's nothing wrong with your lawyers, Mr. Robles. . . . What do you think

another lawyer is going to do?

The district court then conversed almost exclusively with Robles and the prosecutor for ten minutes. When the court finally addressed Gallagher, it was to ask whether he spoke Spanish, to which Gallagher replied in the negative. Gallagher then immediately asked for a continuance so he could "have an opportunity to look at the PSR." The court eventually granted Gallagher a twenty-minute recess, but emphasized that "there's no objection that could alter the ten-year [statutory] minimum."

Further illustrating Gallagher's ambiguous role is the manner in which the district court addressed Gallagher while it was sentencing Robles. Although the district court allowed a brief recess for Gallagher to confer with Robles, the only question the court directed to Gallagher following the recess was to ask whether Gallagher "had an opportunity to answer some questions that [Robles] has?" The nature of Robles's and Gallagher's discussions remains unclear and it is difficult to know whether Gallagher merely answered Robles's questions or actually advised him on what to do. Following the recess, the court did not ask Gallagher whether Robles had any objections to the PSR. Moreover, while addressing Robles's forfeiture sentence, the district court had to inform Gallagher of the terms of the plea agreement because Gallagher did not receive a copy of the plea agreement before Robles was sentenced.

Some facts do seem to indicate that Gallagher was appointed only as Robles's standby counsel during the sentencing hearing. The court did not enter an order appointing Gallagher as Robles's counsel during the May 10 hearing; in fact, an order appointing the Federal Public Defender was not entered until nine days after the hearing and entry of the judgment of conviction and sentence, and then only for purposes of this appeal. Also, the district court made no finding on the record that Robles qualified for appointed counsel. *See* General Order No. 2006-7, § IV.D (S.D. Tex. May 12, 2006) ("The determination of

eligibility for representation under the [Criminal Justice Act] is a judicial function to be performed by a judge or magistrate judge after making appropriate inquiries concerning the person's financial condition.").

Nonetheless, there are other facts that suggest that Gallagher was indeed Robles's appointed counsel. While Robles presently contends that he was not represented by counsel at his sentencing, during the hearing itself, Robles referred to Gallagher as "the attorney who is *representing me* today." (emphasis added). Moreover, Gallagher took actions consistent with serving as appointed counsel. For example, Robles's appellate counsel asserted in oral argument that "Mr. Gallagher did not act as counsel under the Sixth Amendment. If he had been counsel, he would have asked for a continuance and he would have taken the time to investigate." But Gallagher *did,* in fact, ask for a continuance (although not a rescheduling of the sentencing) at the hearing, suggesting his awareness of a broader responsibility than the "limited role that a standby attorney plays." *Taylor*, 933 F.2d at 312.

Compounding our difficulties in parsing the events at Robles's sentencing is the conspicuous absence of any statement by Gallagher himself as to whether he believed that he had been appointed counsel. Robles's beliefs at the time of the hearing or later, while relevant, are, by themselves, insufficient.[12] Given the conflicting signals sent by the record, testimony by Gallagher as to what he believed his role to be and whether he considered himself acting as Robles's counsel, together with fact findings by the district court as to whether Robles had counsel at the hearing, is important to the outcome of Robles's appeal.

E. *District Court's Obligations on Remand*

On remand, the district court should take testimony from Gallagher. The

---

[12] *Cf. In re Grand Jury Subpoena*, 415 F.3d 333, 339 (4th Cir. 2005) (explaining that "[a]n individual's subjective belief that he is represented is not alone sufficient to create an attorney-client relationship" in the attorney–client privilege context).

court may take any other testimony it considers advisable. The court should decide whether Robles had counsel at the May 10 sentencing hearing.[13] The court requests that the district court enter detailed findings of fact and conclusions of law. The clerk of the district court should then transmit to this court a supplemental record containing the district court's findings of fact and conclusions of law, together with a transcript of the hearing and any applicable exhibits. Upon receipt of the foregoing materials, this court will rule on Robles's remaining challenges to his sentence. Counsel will be afforded an opportunity to file supplemental briefs.

### III.  CONCLUSION

For the reasons stated above, we AFFIRM Robles's conviction. We enter a limited REMAND to the district court for further proceedings relating to his sentence consistent with this opinion. When the district court's supplemental record is received by this court, it will be referred to this panel, which will then rule on Robles's remaining challenges to his sentence.

---

[13] We note, as we have emphasized above, the inquiry as to whether Robles had counsel is not an inquiry as to whether Robles was prejudiced. As raised by this appeal, the issue is exclusively a *Cronic* issue.